Michael E. Salzman (MS 6485)
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, NY 10004
(212) 837-6000
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



| | | |
|---|---|---|
| CHRISTIE'S INC., | | |
| | Plaintiff, | 05 Civ. _____ |
| -against- | | **COMPLAINT** |
| DOMINICA HOLDING CORP. d/b/a MIHALARIAS ART and STAVROS MIHALARIAS, | | |
| | Defendants. | |

Plaintiff Christie's Inc. ("Christie's" or "plaintiff"), by and through its attorneys Hughes Hubbard & Reed LLP, complaining of defendants Dominica Holding Corporation d/b/a Mihalarias Art ("Dominica") and Stavros Mihalarias ("Mihalarias") (collectively, "defendants"), alleges as follows:

## NATURE OF THE ACTION

1. Plaintiff brings this action for monetary damages arising out of defendants' failure and refusal to pay at least $918,240 in purchase price and buyer's commission due and owing to it for art works purchased at auction, plus expenses and attorney's fees.

## PARTIES

2. Christie's is a corporation incorporated under the laws of the State of New York with its principal place of business at 20 Rockefeller Plaza, New York, New York. Christie's is a fine art auction house.

3.  Dominica is a corporation organized under the laws of the Marshall Islands with its principal place of business in a foreign state.  On information and belief, Dominica's principal place of business is 260 Kifissias Ave. and Diligianni Str., 145 62 Kifissia, Athens, Greece, and its registered address is Ageltake Road, Ageltake Island, Mazuro MH 96 960, Marshall Islands.

4.  On information and belief, Mihalarias is the president and owner of Dominica, a citizen of Greece, and not a citizen of the United States or any State of the United States.

## JURISDICTION AND VENUE

5.  This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a) as there is diversity of citizenship between the parties to this action and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6.  Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to plaintiff's claims occurred in this District.  In addition, because defendants are subject to personal jurisdiction based upon sufficient minimum contacts in this District, venue is proper pursuant to 28 U.S.C. § 1391(c).  Furthermore, by bidding at auction at Christie's, Dominica and Mihalarias submitted to the jurisdiction of this Court.  (See a copy of the Conditions of Sale ¶ 9, annexed hereto as Exhibit A.)

## FACTUAL ALLEGATIONS

7.  On May 4, 2005, Christie's held an auction entitled "Prints and Multiples" at 20 Rockefeller Plaza, New York, New York ("the Auction").

8.  Prior to the Auction, Mihalarias registered to bid at the Auction on behalf of Dominica.

9.  All art works offered for sale at the Auction were available for inspection at viewings open to the general public in the days prior to the Auction.

15.   Under the Conditions of Sale, Dominica was required to pay Christie's for its purchases of the Marilyn Prints and the Eleven Additional Print Lots within seven days after the Auction, that is May 11, 2005.  (Ex. A ¶ 4(b).)

16.   The Conditions of Sale also state that "[i]f the buyer fails to make payment in full in good cleared funds within the time required by paragraph 4(b) above, we shall be entitled in our absolute discretion to exercise one or more of the following rights or remedies . . . (ii) to hold the defaulting buyer liable for the total amount due and to commence legal proceedings for its recovery together with interest, legal fees and costs to the fullest extent permitted under applicable law . . . (iv) to resell the property publicly or privately on such terms as we shall think fit."  (Ex. A ¶ 4(f).)

17.   Further, pursuant to the Conditions of Sale, if Christie's were to resell the property, "the defaulting buyer shall be liable for the payment of any deficiency between the total amount originally due to us and price obtained upon resale as well as for all costs, expenses, damages, legal fees and commissions and premiums of whatever kind associated with both sales or otherwise arising from the default. "  (Ex. A ¶ 4(f).)

18.   The Conditions of Sale also state that "[b]y bidding at auction, you agree to be bound by these terms."  (Ex. A, Preface to Conditions of Sale.)

19.   Additionally, pursuant to the Conditions of Sale, "where several amounts are owed by the buyer . . . in respect of different transactions" Christie's is entitled "to apply any amount paid to discharge any amount owed in respect of any particular transaction, whether or not the buyer so directs."  (Ex. A ¶ 4(f)(vii).)

20.   On May 5, 2005, Mihalarias returned to 20 Rockefeller Plaza and, upon examining the Marilyn Prints, stated that defendants refused to remit the amount Dominica owed under the Marilyn Contract.

21.   By letter dated May 5, 2005, Christie's, through its General Counsel, reminded Dominica and Mihalarias that the Auction was held on an "as is" basis.

22.   By letters dated May 12, 2005, Dominica and Mihalarias confirmed the earlier repudiation of the Marilyn Contract in writing.  (The letters are annexed hereto as Exhibits C and D.)

23.   In these letters, Dominica and Mihalarias stated that, despite their repudiation of the Marilyn Contract, they were willing to "complete [their] purchase" of the Eleven Additional Print Lots.  (Exs. C and D.)

24.   Acting on Mihalarias's telephoned request that Christie's attempt to sell them to a third party, Christie's resold the Marilyn Prints to a third party for $575,000, inclusive of buyer's premium.

25.   Through its counsel, Christie's on May 25, 2005 warned defendants that, pursuant to Christie's rights under the Conditions of Sale, any payments purportedly made with respect to the Eleven Additional Print Lots would be applied first to the amount due under the Marilyn Contract.  (This letter is annexed hereto as Exhibit E.)

26.   Dominica has failed to pay any amount due for either the Marilyn Prints or the Eleven Additional Print Lots.

27.   On September 1, 2005, in the continued absence of payment, Christie's elected to cancel the sale of two of the Eleven Additional Print Lots:  Lot 679, Andy Warhol, *St. Apollonia*, a set of four screen prints, and Lot 398, Keith Haring, *Flowers Suite*, a set of five screen prints.

Christie's notified Dominica of its cancellation and intent to resell Lots 679 and 398 through letter from its counsel, and additionally reminded Dominica of its contractual responsibility for any shortfall and expenses resulting from any future resale.  (This letter is annexed hereto as Exhibit F.)

## FIRST CAUSE OF ACTION
### (Breach of the Marilyn Contract)

28.   Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 27 above with the same force and effect as if here set forth in full.

29.   Dominica repudiated the Marilyn Contract with its statement of May 5, 2005 and its letter of May 12, 2005.

30.   Dominica breached the Marilyn Contract by failing to pay plaintiff the purchase price, including buyer's premium due and owing it under the Marilyn Contract.

31.   As a direct and proximate result of the foregoing, Christie's has been damaged in an amount not less than $135,400, plus applicable interest, costs, and attorney's fees.

## SECOND CAUSE OF ACTION
### (Breach of the Eleven Additional Print Contracts)

32.   Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 31 above with the same force and effect as if here set forth in full.

33.   Dominica breached the Eleven Additional Print Contracts by failing to pay plaintiff the purchase price, including buyer's premium, due and owing to it under the Eleven Additional Print Contracts.

34.   Christie's has not resold the Eleven Additional Print Lots.

35.   As a direct and proximate result of the foregoing, plaintiff brings this action for the price, as it has been damaged in an amount not less than $207,840, plus applicable interest, costs, and attorney's fees.

### THIRD CAUSE OF ACTION
#### (As to Mihalarias in his Individual Capacity)

36.   Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 35 above with the same force and effect as if here set forth in full.

37.   In the alternative, if Dominica is not the true buyer or is not a proper and distinct legal entity, then Mihalarias is liable in his individual capacity for the damages resulting from the breaches of contract set forth above.

### DEMAND FOR RELIEF

WHEREFORE, plaintiff demands judgment against defendants for compensatory, consequential and restitutionary damages of not less than $343,240; for applicable interest to all damages; for attorney's fees and expenses pursuant to the Marilyn Contract and the Eleven Additional Print Contracts; and for such other legal relief or equitable remedies as this Court deems just and proper.

Dated:   New York, New York
         October 14, 2005

HUGHES HUBBARD & REED LLP

By: _____
         Michael E. Salzman (MS 6485)
One Battery Park Plaza
New York, New York 10004-1482
(212) 837-6000

Attorneys for Plaintiff

955451_1

# Exhibit A

# Prints and Multiples

## TUESDAY 3 MAY 2005
## WEDNESDAY 4 MAY 2005

### AUCTION

Tuesday 3 May 2005
at 10.00 am (Lots 1–161)
and 2.00 pm (Lots 162–328)
Wednesday 4 May 2005
at 10.00 am (Lots 329–504)
and 2.00 pm Lots (505–695)

20 Rockefeller Plaza
New York, NY 10020

### AUCTION CODE AND NUMBER

In sending absentee bids or making enquiries,
this sale should be referred to as
**VERONICA–1513**

### AUCTIONEERS

Christopher Burge (# 761543)
Barbara Strongin (# 849133)
Thomas Lecky (#1135170)
Richard Brierley (# 1133781)

### SPECIALISTS

Kelly Troester
Loren Lieberman
Cary Leibowitz
Anne Henry
Gia Gunthel
Freyda Spira
Tel: +1 212 636 2290
Fax: +1 212 636 4926

ADMINISTRATOR
Rachel Smith
Tel: +1 212 636 2284
Fax: +1 212 636 4928

ART HANDLER
Edgar Aramboles
Tel: +1 212 636 6756

BUSINESS MANAGER
Robin Roche
Tel: +1 212 636 2639

### EMAIL

First initial followed by last name @christies.com
(eg. Rachel Smith = rsmith@christies.com)
For general enquiries about this auction, email
should be addressed to the auction administrator

Front cover: Lot 94
Back cover: Lot 658

### VIEWING

| | |
|---|---|
| Friday 29 April | 10.00 am – 5.00 pm |
| Saturday 30 April | 10.00 am – 5.00 pm |
| Sunday 1 May | 1.00 pm – 5.00 pm |
| Monday 2 May | 10.00 am – 5.00 pm |

### SERVICES

### ABSENTEE AND TELEPHONE BIDS

Tel: +1 212 636 2437
Fax: +1 212 636 4938

### AUCTION RESULTS

USA: +1 212 703 8080
UK: +44 (0)20 7627 2707
christies.com

### CLIENT ADVISORY

Carl B. Adams
Hadley Freeman-Lehrman
Maria C. Los
Mary Libby
Gregory J. Ghyka
Amy D. McCready
Tel: +1 212 636 2510
Fax: +1 212 636 4941

### INSURANCE

Tel: +1 212 636 2353
Fax: +1 212 492 4947

### The Property of

Avon Old Farms School
The Brooklyn Museum of Art
The Estate of Clinton Hill
The Francey and Dr. Martin L. Gecht Collection
The Estate of Maria-Gaetana Matisse, Sold to Benefit the
Metropolitan Museum of Art
The Los Angeles County Museum of Art, Sold to Benefit
the Acquisitions Fund
The Fernand and Beatrice Leval Collection
The Helen and David B. Pall Collection
The Prudential Collection
Mr. and Mrs. Bagley Wright

### PAYMENT

Buyers
Tel: +1 212 636 2495
Fax: +1 212 636 4939

Consignors
Tel: +1 212 636 2495
Fax: +1 212 636 4939

### ART TRANSPORT

Tel: +1 212 636 2480
Fax: +1 212 636 4937

### STORAGE AND COLLECTION

Tel: +1 212 636 2495
Fax: +1 212 636 4939

### CONDITIONS OF SALE

This auction is subject to Important Notices,
Conditions of Sale and to Reserves

### BUYING AT CHRISTIE'S

For an overview of the process, see the Buying at
Christie's section.

[35]
christies.com

## CHRISTIE'S

# Conditions of Sale

These Conditions of Sale and the Important Notices and Explanation of Cataloguing Practice contain all the terms on which Christie's and the seller contract with the buyer. They may be amended by posted notices or oral announcements made during the sale. By bidding at auction you agree to be bound by these terms.

## 1. CHRISTIE'S AS AGENT

Except as otherwise stated Christie's acts as agent for the seller. The contract for the sale of the property is therefore made between the seller and the buyer.

## 2. BEFORE THE SALE

**(a) Examination of property**
Prospective buyers are strongly advised to examine personally any property in which they are interested, before the auction takes place. Condition reports are usually available on request. Neither Christie's nor the seller provides any guarantee in relation to the nature of the property apart from the Limited Warranty in paragraph 6 below. The property is otherwise sold "as is."

**(b) Catalogue and other descriptions**
Our cataloguing practice is explained in the Important Notices and Explanation of Cataloguing Practice after the catalogue entries. All statements by us in the catalogue entry for the property or in the condition report, or made orally or in writing elsewhere, are statements of opinion and are not to be relied on as statements of fact. Such statements do not constitute a representation, warranty or assumption of liability by us of any kind. References in the catalogue entry or the condition report to damage or restoration are for guidance only and should be evaluated by personal inspection by the bidder or a knowledgeable representative. The absence of such a reference does not imply that an item is free from defects or restoration, nor does a reference to particular defects imply the absence of any others. Estimates of the selling price should not be relied on as a statement that this is the price at which the item will sell or its value for any other purpose. Except as set forth in paragraph 6 below, neither Christie's nor the seller is responsible in any way for errors and omissions in the catalogue or any supplemental material.

**(c) Buyer's responsibility**
Except as stated in the Limited Warranty in paragraph 6 below, all property is sold "as is" without any representation or warranty of any kind by Christie's or the seller. Buyers are responsible for satisfying themselves concerning the condition of the property and the matters referred to in the catalogue entry.

## 3. AT THE SALE

**(a) Refusal of admission**
Christie's has the right, at our complete discretion, to refuse admission to the premises or participation in any auction and to reject any bid.

**(b) Registration before bidding**
A prospective buyer must complete and sign a registration form and provide identification before bidding. We may require the production of bank or other financial references.

**(c) Bidding as principal**
When making a bid, a bidder is accepting personal liability to pay the purchase price, including the buyer's premium and all applicable taxes, plus all other applicable charges, unless it has been explicitly agreed in writing with Christie's before the commencement of

the sale that the bidder is acting as agent on behalf of an identified third party acceptable to Christie's, and that Christie's will only look to the principal for payment.

**(d) Absentee bids**
We will use reasonable efforts to carry out written bids delivered to us prior to the sale for the convenience of clients who are not present at the auction in person, by an agent or by telephone. Bids must be placed in the currency of the place of the sale. Please refer to the catalogue for the Absentee Bids Form. If we receive written bids on a particular lot for identical amounts, and at the auction these are the highest bids on the lot, it will be sold to the person whose written bid was received and accepted first. Execution of written bids is a free service undertaken subject to other commitments at the time of the sale and we do not accept liability for failing to execute a written bid or for errors and omissions in connection with it.

**(e) Telephone bids**
If a prospective buyer makes arrangements with us prior to the commencement of the sale we will use reasonable efforts to contact them to enable them to participate in the bidding by telephone but we do not accept liability for failure to do so or for errors and omissions in connection with telephone bidding.

**(f) Currency converter**
At some auctions a currency converter may be operated. Errors may occur in the operation of the currency converter and we do not accept liability to bidders who follow the currency converter rather than the actual bidding in the saleroom.

**(g) Video or digital images**
At some auctions there may be a video or digital screen. Errors may occur in its operation and in the quality of the image and we do not accept liability for such errors.

**(h) Reserves**
Unless otherwise indicated, all lots are offered subject to a reserve, which is the confidential minimum price below which the lot will not be sold. The reserve will not exceed the low estimate printed in the catalogue. If any lots are not subject to a reserve, they will be identified with the symbol ◦ next to the lot number. The auctioneer may open the bidding on any lot below the reserve by placing a bid on behalf of the seller. The auctioneer may continue to bid on behalf of the seller up to the amount of the reserve, either by placing consecutive bids or by placing bids in response to other bidders. With respect to lots that are offered without reserve, unless there are already competing bids, the auctioneer, in his or her discretion, will generally open the bidding at 50% of the low pre-sale estimate for the lot. In the absence of a bid at that level, the auctioneer will proceed backwards in his or her discretion until a bid is recognized, and then continue up from that amount. Absentee bids will, in the absence of a higher bid, be executed at approximately 50% of the low pre-sale estimate or at the amount of the bid if it is less than 50% of the low pre-sale estimate. In the event that there is no bid on a lot, the auctioneer may deem such lot unsold.

**(i) Auctioneer's discretion**
The auctioneer has the right at his absolute and sole discretion to refuse any bid, to advance the bidding in such a manner as he may decide, to withdraw or divide any lot, to combine any two or more lots and, in the case of error or dispute, and whether during or after the

sale, to determine the successful bidder, to continue the bidding, to cancel the sale or to reoffer and resell the item in dispute. If any dispute arises after the sale, our sale record is conclusive.

**(j) Successful bid and passing of risk**
Subject to the auctioneer's discretion, the highest bidder accepted by the auctioneer will be the buyer and the striking of his hammer marks the acceptance of the highest bid and the conclusion of a contract for sale between the seller and the buyer. Risk and responsibility for the lot (including frames or glass where relevant) passes to the buyer at the expiration of seven calendar days from the date of the sale or on collection by the buyer if earlier.

## 4. AFTER THE SALE

**(a) Buyer's premium**
In addition to the hammer price, the buyer agrees to pay to us the buyer's premium together with any applicable value added tax, sales or compensating use tax or equivalent tax in the place of sale. The buyer's premium is 20% of the hammer price on each lot up to and including $200,000 plus 12% of any amount in excess of $200,000.

**(b) Payment and passing of title**
Immediately following the sale, the buyer must provide us with his or her name and permanent address and, if so requested, details of the bank from which payment will be made. The buyer must pay the full amount due (comprising the hammer price, buyer's premium and any applicable taxes) not later than 4.30pm on the seventh calendar day following the sale. This applies even if the buyer wishes to export the lot and an export license is, or may be, required. The buyer will not acquire title to the lot until all amounts due to us from the buyer have been received by us in good cleared funds even in circumstances where we have released the lot to the buyer.

**(c) Collection of purchases**
We shall be entitled to retain items sold until all amounts due to us, or to Christie's International plc, or to any of its affiliates, subsidiaries or parent companies worldwide, have been received in full in good cleared funds or until the buyer has satisfied such other terms as we, in our sole discretion, shall require. Subject to this, the buyer shall collect purchased lots within seven calendar days from the date of the sale unless otherwise agreed between us and the buyer.

**(d) Packing, handling and shipping**
Although we shall use reasonable efforts to take care when handling, packing and shipping a purchased lot, we are not responsible for the acts or omissions of third parties whom we might retain for these purposes. Similarly, where we may suggest other handlers, packers or carriers if so requested, we do not accept responsibility or liability for their acts or omissions.

**(e) Export licence**
Unless otherwise agreed by us in writing, the fact that the buyer wishes to apply for an export license does not affect his or her obligation to make payment within seven days nor our right to charge interest or storage charges on late payment. If the buyer requests us to apply for an export license on his or her behalf, we shall be entitled to make a charge for this service. We shall not be obliged to rescind a sale nor to refund any interest or other expenses incurred by the buyer where payment is made by the buyer in circumstances where an export license is required.

**(f) Remedies for non payment**

20/05/04

If the buyer fails to make payment in full in good cleared funds within the time required by paragraph 4(b) above, we shall be entitled in our absolute discretion to exercise one or more of the following rights or remedies (in addition to asserting any other rights or remedies available to us by law):

(i)    to charge interest at such rate as we shall reasonably decide;

(ii)   to hold the defaulting buyer liable for the total amount due and to commence legal proceedings for its recovery together with interest, legal fees and costs to the fullest extent permitted under applicable law;

(iii)  to cancel the sale;

(iv)   to resell the property publicly or privately on such terms as we shall think fit;

(v)    to pay the seller an amount up to the net proceeds payable in respect of the amount bid by the defaulting buyer;

(vi)   to set off against any amounts which we, or Christie's International plc, or any of its affiliates, subsidiaries or parent companies worldwide, may owe the buyer in any other transactions, the outstanding amount remaining unpaid by the buyer;

(vii)  where several amounts are owed by the buyer to us, or to Christie's International plc, or to any of its affiliates, subsidiaries or parent companies worldwide, in respect of different transactions, to apply any amount paid to discharge any amount owed in respect of any particular transaction, whether or not the buyer so directs;

(viii) to reject at any future auction any bids made by or on behalf of the buyer or to obtain a deposit from the buyer before accepting any bids;

(ix)   to exercise all the rights and remedies of a person holding security over any property in our possession owned by the buyer, whether by way of pledge, security interest or in any other way, to the fullest extent permitted by the law of the place where such property is located. The buyer will be deemed to have granted such security to us and we may retain such property as collateral security for such buyer's obligations to us;

(x)    to take such other action as we deem necessary or appropriate.

If we resell the property under paragraph (iv) above, the defaulting buyer shall be liable for payment of any deficiency between the total amount originally due to us and the price obtained upon resale as well as for all costs, expenses, damages, legal fees and commissions and premiums of whatever kind associated with both sales or otherwise arising from the default. If we pay any amount to the seller under paragraph (v) above, the buyer acknowledges that Christie's shall have all of the rights of the seller, however arising, to pursue the buyer for such amount.

(g) Failure to collect purchases
Where purchases are not collected within seven calendar days from the date of the sale, whether or not payment has been made, we shall be permitted to remove the property to a third party warehouse at the buyer's expense, and only release the items after payment in full has been made of removal, storage, handling, insurance and any other costs incurred, together with payment of all other amounts due to us.

(h) Selling Property at Christie's
In addition to expenses such as transport and insurance, all consignors pay a commission according to a fixed scale of charges based upon the value of the property sold by the consignor at Christie's in a calendar year. Commissions are charged on a sale by sale basis.

5. EXTENT OF CHRISTIE'S LIABILITY
We agree to refund the purchase price in the circumstances of the Limited Warranty set out in paragraph 6 below. Apart from that, neither the seller nor we, nor any of our officers, employees or agents, are responsible for the correctness of any statement of whatever kind concerning any lot, whether written or oral, nor for any other errors or omissions in description or for any faults or defects in any lot. Except as stated in paragraph 6 below, neither the seller, ourselves, our officers, employees or agents, give any representation, warranty or guarantee or assume any liability of any kind in respect of any lot with regard to merchantability, fitness for a particular purpose, description, size, quality, condition, attribution, authenticity, rarity, importance, medium, provenance, exhibition history, literature or historical relevance. Except as required by local law any warranty of any kind whatsoever is excluded by this paragraph.

6. LIMITED WARRANTY
Subject to the terms and conditions of this paragraph, Christie's warrants for a period of five years from the date of the sale that any property described in headings printed in UPPER CASE TYPE (i.e. headings having all capital-letter type) in this catalogue (as such description may be amended by any saleroom notice or announcement) which is stated without qualification to be the work of a named author or authorship, is authentic and not a forgery. The term "author" or "authorship" refers to the creator of the property or to the period, culture, source or origin, as the case may be, with which the creation of such property is identified in the UPPER CASE description of the property in this catalogue. Only UPPER CASE TYPE headings of lots in this catalogue indicate what is being warranted by Christie's. Christie's warranty does not apply to supplemental material which appears below the UPPER CASE TYPE headings of each lot and Christie's is not responsible for any errors or omissions in such material. The terms used in the headings are further explained in Important Notices and Explanation of Cataloguing Practice. The warranty does not apply to any heading which is stated to represent a qualified opinion. The warranty is subject to the following:

(i)    It does not apply where (a) the catalogue description or saleroom notice corresponded to the generally accepted opinion of scholars or experts at the date of the sale or fairly indicated that there was a conflict of opinions; or (b) correct identification of a lot can be demonstrated only by means of either a scientific process not generally accepted for use until after publication of the catalogue or a process which at the date of publication of the catalogue was unreasonably expensive or impractical or likely to have caused damage to the property.

(ii)   The benefits of the warranty are not assignable and shall apply only to the original buyer of the lot as shown on the invoice originally issued by Christie's when the lot was sold at auction.

(iii)  The original buyer must have remained the owner of the lot without disposing of any interest in it to any third party.

(iv)   The buyer's sole and exclusive remedy against Christie's and the seller, in place of any other remedy which might be available, is the cancellation of the sale and the refund of the original purchase price paid for the lot. Neither Christie's nor the seller will be liable for any special, incidental or consequential damages including, without limitation, loss of profits nor for interest.

(v)    The buyer must give written notice of claim to us within five years from the date of the auction. It is Christie's general policy, and Christie's shall have the right, to require the buyer to obtain the written opinions of two recognized experts in the field, mutually acceptable to Christie's and the buyer, before Christie's decides whether or not to cancel the sale under the warranty.

(vi)   The buyer must return the lot to the Christie's saleroom at which it was purchased in the same condition as at the time of the sale.

7. COPYRIGHT
The copyright in all images, illustrations and written material produced by or for Christie's relating to a lot including the contents of this catalogue, is and shall remain at all times the property of Christie's and shall not be used by the buyer, nor by anyone else, without our prior written consent. Christie's and the seller make no representation or warranty that the buyer of a property will acquire any copyright or other reproduction rights in it.

8. SEVERABILITY
If any part of these Conditions of Sale is found by any court to be invalid, illegal or unenforceable, that part shall be discounted and the rest of the conditions shall continue to be valid to the fullest extent permitted by law.

9. LAW AND JURISDICTION
The rights and obligations of the parties with respect to these Conditions of Sale, the conduct of the auction and any matters connected with any of the foregoing shall be governed and interpreted by the laws of the jurisdiction in which the auction is held. By bidding at auction, whether present in person or by agent, by written bid, telephone or other means, the buyer shall be deemed to have submitted, for the benefit of Christie's, to the exclusive jurisdiction of the courts of that country, state, county or province, and (if applicable) of the federal courts sitting in such state.

20/05/04



658

**658**
**ANDY WARHOL**
*Marilyn* (F. & S. 22–31)

the complete set of ten screenprints in colors, 1967, on wove paper,
eight signed with initals and dated in pencil on the reverse, two signed
and dated in pencil on the reverse, all stamp numbered 27/250 (there
were also 26 artist's proofs lettered A–Z), published by Factory
Additions, New York, all the full sheets, taped to the support at the
reverse of the sheet edges and in the center, soft creasing with
associated minor ink loss and slight paper separation at the sheet
corners, pale staining on the reverse, (F. & S. 22) with an area of pale
blue staining in the upper right corner, otherwise all apparently in good
condition, three examined out of the frames, all framed

all S. 36 x 36 in. (914 x 914 mm.)                                    (10)

**Estimate: $400,000–500,000**



658



398

**398**
**KEITH HARING**
*Flowers Suite*

the complete set of five screenprints in colors, 1990, on Coventry, all
signed and dated in pencil, all numbered 73/100 (there were also 15 artist's
proofs), published by Shafrazi Editions, New York, all the full sheets
(printed to one side), all apparently in very good condition, not examined
out of the frames, lacking the title page and green plastic portfolio

all S. 51 x 39¼ in. (1296 x 997 mm.)                                    (5)

**Estimate: $20,000–30,000**



629



631

PROPERTY OF A WEST COAST PRIVATE COLLECTOR

**629**
**FRANK STELLA**
Talladega Three III, from *Circuits* (A. 137)

relief-printed etching in colors, 1982, on TGL handmade, signed and
dated in pencil, numbered 22/30 (there were also 10 artist's proofs),
with the Tyler Graphics, Ltd. blindstamp, Mount Kisco, New York, the full
sheet, apparently in excellent condition, not examined out of the frame

S. 66 x 51⅜ in. (1676 x 1305 mm.)

**Estimate: $5,000–7,000**

**630 No Lot**

ANOTHER PROPERTY

**631**
**FRANK STELLA**
Estoril Three II (A. 139)

engraving, relief-printed etching and woodcut in colors, 1982, signed
and dated in pencil, numbered 'AP VIII' (of 10 artist's proofs, the edition
was 30), published by Tyler Graphics, Ltd. Mount Kisco, New York, the
full sheet, apparently in excellent condition, not examined out of the
frame

S. 66¼ x 51½ in. (1683 x 1308 mm.)

**Estimate: $8,000–12,000**



632

PROPERTY OF A WEST COAST PRIVATE COLLECTOR

**632**
**FRANK STELLA**
Shards II (A. 145)

offset lithograph and screenprint in colors, 1982, on Arches Cover,
signed and dated in pencil, numbered 'A.P. VIII' (of 20 artist's proofs, the
edition was 100), published by Petersburg Press, New York and London,
the full sheet, extremely pale staining, a few very soft creases at
the extreme sheet edges, otherwise apparently in very good condition,
not examined out of the frame

S. 39¾ x 45 in. (1010 x 1143 mm.)

**Estimate: $4,000-6,000**




633

**633**
**FRANK STELLA**
The Symphony

lithograph and screenprint in colors, 1990, on Saunders mould-made,
signed and dated in pencil, numbered 'AP 11' (an artist's proof, the
edition was 175), with the Tyler Graphics, Ltd. blindstamp, Mount Kisco,
New York, the full sheet, apparently in excellent condition, not
examined out of the frame

S. 81 x 40 in. (2058 x 1016 mm.)

**Estimate: $4,000-6,000**



634

**634**
**FRANK STELLA**
Jonah Historically Regarded, from *Moby Dick Engravings*

etching, aquatint, engraving, screenprint and carborundum in colors,
1992, on TGL handmade, signed and dated in pencil, numbered 18/30
(there were also 14 artist's proofs), with the Tyler Graphics, Ltd.
blindstamp, Mount Kisco, New York, the full sheet, apparently in
excellent condition, not examined out of the frame

S. 73⅞ x 54¾ in. (1877 x 1391 mm.)

**Estimate: $5,000-7,000**

**635**
**FRANK STELLA**
Stubb and Flask Kill a Right Whale, from *Moby Dick Engravings*

relief-etching, aquatint and engraving in colors, 1992, on hand-colored TGL handmade, signed and dated in pencil, numbered 27/27 (there were also 7 artist's proofs), with the Tyler Graphics, Ltd. blindstamp, Mount Kisco, New York, the full sheet, apparently in excellent condition, not examined out of the frame

S. 73¼ x 53½ in. (1860 x 1360 mm.)

Estimate: $4,000-6,000



635

**636**
**FRANK STELLA**
The Battering Ram, from *Moby Dick Deckle Edges*

lithograph, etching, aquatint, screenprint, and collograph in colors, 1993, on TGL handmade, signed and dated in pencil, numbered 20/30 (there were also 8 artist's proofs), with the Tyler Graphics, Ltd. blindstamp, Mount Kisco, New York, the full sheet, hinged to the support in places at the reverse of the sheet edges, otherwise in excellent condition, framed

S. 58⅞ x 35½ in. (1494 x 901 mm.)

Estimate: $4,000-6,000



636

**637**
**FRANK STELLA**
Fanattia, from *Imaginary Places*

etching, engraving, lithograph, stamping, woodcut, mezzotint and relief in colors, 1995, on TGL handmade, signed and dated in pencil, numbered 7/24 (there were also 12 artist's proofs), with the Tyler Graphics, Ltd. blindstamp, Mount Kisco, New York, the full sheet, apparently in excellent condition, not examined out of the frame

S. 54½ x 41 in. (1385 x 1041 mm.)

Estimate: $5,000-7,000



637



**638**

**638**
**FRANK STELLA**
Libertina, from *Imaginary Places*

relief, screenprint, etching, aquatint, lithograph and engraving in colors,
1995, on TGL handmade, signed and dated in pencil, numbered 44/50
(there were also 12 artist's proofs), with the Tyler Graphics Ltd.
blindstamp, Mount Kisco, New York, the full sheet, a few minor
pressure marks near the upper right corner, otherwise apparently in
excellent condition, not examined out of the shrinkwrap

S. 49⅜ x 21⅝ in. (1254 x 549 mm.)

**Estimate: $4,000–6,000**



**639**

**639**
**DONALD SULTAN (B. 1951)**
Black Lemon April 20, 1987; and Black Lemon May 18, 1987

two aquatints, 1987, on wove papers, both signed with initials, titled
and dated in pencil, numbered 'AP 6/10' (the edition was 14), and 12/75
(there were also 16 artist's proofs) respectively, both published by
Parasol Press, New York, the full sheet and with full margins
respectively, both apparently in very good condition, not examined out
of the frames

P. 62 x 48 in. (1575 x 1219 mm.)
S. 62½ x 48½ in. (1589 x 1232 mm.);
P. 39½ x 29½ in. (1004 x 749 mm.)
S. 47¾ x 36 in. (1212 x 914 mm.)                                      (2)

**Estimate: $5,000–7,000**



**640**

**640**
**DONALD SULTAN**
Orange; Butterfly; Button; and Eightball

four lithographs in colors, 1996, on TGL handmade, all initialed, titled
and dated in pencil, numbered 'AP 4/18', 'AP 9/12', 'AP 8/14' and 'AP
7/12' respectively (the editions were 30, 40, 30 and 30 respectively), all
with the Tyler Graphics, Ltd. blindstamp, Mount Kisco, New York, all
with full margins, hinged to the support in places at the reverse of the
upper margin edges (slightly showing through), otherwise all apparently
in very good condition, one examined out of the frame

all S. 42½ x 29½ in. (1080 x 750 mm.)                                 (4)

**Estimate: $6,000–8,000**







659

660

661

PROPERTY OF
A WEST COAST PRIVATE COLLECTOR

**659
ANDY WARHOL**
Vegetable, from *Campbell's Soup I*
(F. & S. 48)

screenprint in colors, 1968, on wove paper,
signed in ink on the reverse, stamp numbered
189/250 (there were also 26 artist's proofs
lettered A-Z), published by Factory Additions,
New York, with full margins, a short abrasion
on the lid, a few lightly rubbed areas in the
red, a few minute losses to the black on the
left side of the label, a small crease to the
right of the K, very minor surface soiling at
the lower left margin corner, attached to the
backboard at the reverse of the margin edges,
otherwise in good condition, framed

Scr. 32 x 18½ in. (825 x 470 mm.)

S. 35 x 23 in. (889 x 584 mm.)

**Estimate: $6,000-8,000**

ANOTHER PROPERTY

**660
ANDY WARHOL**
Green Pea, from *Campbell's Soup I*
(F. & S. 50)

screenprint in colors, 1968, on wove paper,
signed in ink on the reverse, stamp numbered
134/250 (there were also 26 artist's proofs
lettered A-Z), published by Factory Additions,
New York, with full margins, a few soft
creases, a few soft scuffs in the red, a minute
ink loss on the lid and another at the lower
rim, very pale time staining, otherwise in very
good condition, framed

Scr. 31⅞ x 18⅞ in. (806 x 479 mm.)

S. 35 x 23 in. (889 x 584 mm.)

**Estimate: $8,000-10,000**

PROPERTY OF
A WEST COAST PRIVATE COLLECTOR

**661
ANDY WARHOL**
Old Fashioned Vegetable, from
*Campbell's Soup II* (F. & S. 54)

screenprint in colors, 1969, signed in ink on
the reverse, annotated 'H' (one of 26 lettered
artist's proofs, the edition was 250),
published by Factory Additions, New York,
with margins, small creases in the silver lid, a
9-mm. abraision in the center, short scuffs
along the left edge of the can, hinged to the
support in places at the reverse of the margin
edges, otherwise in good condition, framed

Scr. 31⅞ x 18⅝ in. (809 x 472 mm.)

S. 35⅛ x 23 in. (892 x 585 mm.)

**Estimate: $6,000-8,000**

288



662

ANOTHER PROPERTY

**662**
**ANDY WARHOL**
Flowers (F. & S. 65)

screenprint in colors, 1970, on wove paper,
signed in ink on the reverse, stamp numbered
203/250 (there were also 26 artist's proofs
lettered A-Z), published by Factory Additions,
New York, the full sheet, hinged to the
support in places at the reverse of the margin
edges, slight paper separation and creasing at
the sheet edges, otherwise in very good
condition, framed

S. 36 x 36 in. (914 x 914 mm.)

**Estimate: $10,000-12,000**



663

PROPERTY OF
A WEST COAST PRIVATE COLLECTOR

**663**
**ANDY WARHOL**
Flowers (F. & S. 73)

screenprint in colors, 1970, on wove paper,
signed in ink on the reverse, stamp numbered
125/250 (there were also 26 artist's proofs
lettered A-Z), published by Factory Additions,
New York, the full sheet, pale light- staining
showing mostly in the yellow flower, soft
scuffing in the pink flowers, creasing in the
upper and lower left corners, slight paper
separation in the upper left sheet corner, old
hinge remains in places at the reverse of the
sheet edges, otherwise in good condition,
framed

S. 36 x 36 in. (914 x 914 mm.)

**Estimate: $8,000-10,000**



673

PROPERTY OF A WEST COAST PRIVATE COLLECTOR

**673**
**ANDY WARHOL**
*Joseph Beuys, State II* (F. & S. 243)

screenprint in colors, 1980-3, on Lenox Museum Board, signed in pencil, numbered 63/150 (there were also 36 artist's proofs), published by Editions Schellmann & Klüser, Munich and New York, the full sheet, a small dent at the upper right corner, a few small unobtrusive scuffs in the black background, hinged to the support in places at the reverse of the sheet edges, otherwise in very good condition, framed

S. 40 x 32 in. (1016 x 813 mm.)

**Estimate: $5,000–7,000**

VARIOUS PROPERTIES

**674**
**ANDY WARHOL**
*Shoes: One Plate* (F. & S. 256)

screenprint with diamond dust, 1980, on Arches, signed in black crayon on the reverse, numbered 59/60 (there were also 10 artist's proofs), published by the artist, the full sheet, soft scuffs mostly in the black background areas, a small tear at the center of the extreme upper edge, hinged to the support in places at the reverse of the sheet edges, otherwise in very good condition, framed

S. 40 x 59½ in. (1015 x 1511 mm.)

**Estimate: $14,000–18,000**



674



677

PROPERTY OF A WEST COAST PRIVATE COLLECTOR

677
ANDY WARHOL
*$ (9)* (F. & S. 285-6)

the complete set of two unique screenprints in colors, 1982, on Lenox Museum Board, both signed in pencil, both numbered 14/35 (there were also 10 artist's proofs), published by the artist, the full sheets, hinged to the support in places at the reverse of the sheet edges, minor surface soiling and soft creasing at the margin corners, minor paper separation at the extreme sheet corners, (F. & S. 285) with two small nicks and minor ink loss at the upper left margin edge, otherwise both apparently in very good condition, one examined out of the frame

both S. 40 x 32⅛ in. (1016 x 814 mm.)                                                                    (2)

**Estimate: $20,000-30,000**

296

VARIOUS PROPERTIES

**678**
**ANDY WARHOL**
Committee 2000 (F. & S. 289)

screenprint in colors, 1982, on Lenox Museum Board, signed in pencil, numbered 1898/2000 (there were also 200 artist's proofs), published by Committee 2000, the full sheet (printed to two sides), the palest time staining, a small unobtrusive area of surface soiling in the upper right corner, minor surface soiling at the lower sheet edge, otherwise in very good condition, framed

S. 30⅛ x 20⅛ in. (766 x 510 mm.)

**Estimate: $3,000-5,000**



678

**679**
**ANDY WARHOL**
*Saint Apollonia* (F. & S. 330-33)

the complete set of four screenprints in colors, 1984, on Essex Offset Kid Finish, all signed in pencil and numbered 'AP 17/35' (the edition was 250), with the artist's copyright stamp on the reverse, published by Dr. Frank Braun, D\usseldorf, traces of minor surface soiling on the reverse, otherwise all in excellent condition, original cardboard box (minor wear)

all S. 30 x 22 in. (762 x 559 mm.)

**Estimate: $10,000-15,000**




679

PROPERTY OF A WEST COAST PRIVATE COLLECTOR

**680**
**ANDY WARHOL**
Mobil, from *Ads* (F. & S. 350)

screenprint in colors, 1986, on Lenox Museum Board, signed in pencil, numbered 45/190 (there were also 30 artist's proofs), published by Ronald Feldman Fine Arts, Inc., New York, the full sheet, soft scuffing showing mostly in the blue background, a few lightly rubbed areas, otherwise in good condition, framed

S. 38 x 38 in. (965 x 965 mm.)

**Estimate: $6,000-8,000**



680

297

# Exhibit B

**The Eleven Additional Print Lots Purchased,**
**But Not Paid For, By Dominica At The Auction**

| Lot Number | Purchase Price (in Dollars) | Title | Artist |
|---|---|---|---|
| 398 | 38,400.00 | *Flowers Suite* | Keith Haring |
| 629 | 7,800.00 | *Talladega Three III* | Frank Stella |
| 632 | 5,040.00 | *Shards II* | Frank Stella |
| 636 | 6,600.00 | *The Battering Ram* from the series *Moby-Dick Deckle Edges* | Frank Stella |
| 637 | 10,800.00 | *Fanattia* from the series *Imaginary Places* | Frank Stella |
| 638 | 6,600.00 | *Libertina* from the series *Imaginary Places* | Frank Stella |
| 661 | 10,200.00 | *Old Fashioned Vegetable* from the series *Campbell's Soup II* | Andy Warhol |
| 662 | 16,800.00 | *Flowers* | Andy Warhol |
| 674 | 16,800.00 | *Shoes* | Andy Warhol |
| 677 | 78,000.00 | *$(9)* | Andy Warhol |
| 679 | 10,800.00 | *Saint Apollonia* | Andy Warhol |

# Exhibit C

# MIHALARIAS ART

12 May 2005

Mrs. Jo Backer Laird, General Counsel
Christie's
20 Rockefeller Plaza
New York, NY 10020

Dear Mrs. Laird,

I am writing in reference to your letter of May 5, 2005, regarding Christie's "Prints and Multiples" auction in New York on May 4th. As you are aware, I successfully bid on Lot 658 (Andy Warhol, *Marilyn*, set of 10 prints) along with a number of other lots in that auction.

On returning to Christie's the day after the sale to arrange for payment and shipping of my items, I requested that all of my prints be removed from their frames and shipped to me in suitable tubes. At that point I was informed by the head of the department, Mr. Jonathan Rendell, and his assistant, that while most of my items could be shipped as requested, the Warhol prints could not be removed from their frames. I asked for further explanation and Mr. Rendell confirmed that these prints were each permanently affixed to a plexiglass backing. He proceeded to show me as an example how one of the prints was affixed to the plexiglass with permanent glue both along the edges of the print and across the middle of the reverse side of the print. Mr. Rendell also confirmed that, before the sale, Christie's had invited a conservation expert to examine the prints, and the expert verified that the prints were permanently attached and could not be removed without damaging them. When I expressed my dismay and surprise at this discovery, Mr. Rendell agreed that the condition of the prints was highly unusual and that he had never encountered other prints similarly permanently affixed to their frames.

The catalogue description of Lot 658 describes the *Marilyn* prints as "taped in the support". This description fails to clarify either that the "support" is actually a plexiglass backing to the frame, or, most importantly, that the prints are permanently affixed and that the "tape" can never be removed. The mention of "tape" conjures a strip that one often finds holding a print to its support, and that is always very simply removed. "Tape" does not suggest a permanent, irreversible binding. Surprisingly, the catalogue goes on to state that three of the ten prints have been examined out of their frames. To any reader of the catalogue, these words clearly indicate that free and loose prints were examined, rather than valuable prints permanently affixed to sheets of plastic.

260 KIFISSIAS AVE & DILIGIANNI STR. 145 62 KIFISSIA,

TEL: (+30) 210 62 34 320, FAX: (+30) 210 62 30 928, E-MAIL: mihalarias@ath.forthnet.gr

2A SYDNEY CLOSE, LONDON SW3 6HN, TEL: (+44) 207 589 61 14, FAX: (+44) 207 581 29 62

Any art buyer would expect that a work of art could be removed from its support in a frame; Mr. Rendell affirmed he had never seen an example to the contrary. The fact that Christie's expert had determined these prints were permanently affixed to their frames seems, to me, to be a material omission from the catalogue description which would undoubtedly have significant effect on the value of the prints. The *Marilyn* prints were one of the most important and highly priced lots in the auction, even featured on the cover of the auction catalogue. This further suggests to me that the omission was not likely an oversight but rather the catalogue description was carefully crafted to give the impression these prints were in a condition other than what they are.

For your information, I am a fellow of the British Restorer's Association and a fellow of the International Institute of Conservation, and I know very well from my experience that if a conservator tries to remove these prints from the plexiglass support, even successfully or with minor damages, these prints will never be in their original condition. For that reason I do not intend to proceed with the purchase of lot 658. Furthermore, I am happy to complete my purchase of the other lots for which I successfully bid in the auction (i.e., Lots 398, 629, 632, 636, 637, 638, 661, 662, 674, 677 and 679).

I remain confident that this issue can be resolved amicably and to both of our satisfaction. I have been a loyal client of Christie's for the past thirty-five years, both as a seller and a buyer, and have had innumerable positive experiences in my past dealings with your firm. However, I believe in this instance the catalogue description of the prints on which I bid was misleading regarding a critical feature of the prints.

Furthermore, I note that the content and tone of your letter as well as the general attitude of the staff with whom I have discussed the matter at Christie's has been surprisingly insulting and rather abrupt. As stated above, I hope that this issue will be solved amicably and that we may continue to have a mutually beneficial business relationship as we have had for the last thirty-five years.


Sincerely yours


Stavros Mihalarias


Cc Ms. Abigail Lash, Mr. Stephen S. Lash, Mr. Jonathan Rendell

260 KIFISSIAS AVE & DILIGIANNI STR. 145 62 KIFISSIA,

TEL: (+30) 210 62 34 320, FAX: (+30) 210 62 30 928, E-MAIL: mihalarias@ath.forthnet.gr

2A SYDNEY CLOSE, LONDON SW3 6HN, TEL: (+44) 207 589 61 14, FAX: (+44) 207 581 29 62

# Exhibit D

# DOMINICA HOLDING CORP.

Ageltake road, Ageltake Island, Mazuro MH 96 960, Marshall Islands

12 May 2005

Mrs. Jo Backer Laird, General Counsel
Christie's
20 Rockefeller Plaza
New York, NY 10020

Dear Mrs. Laird,

I am writing in reference to your letter of May 5, 2005, regarding Christie's "Prints and Multiples" auction in New York on May 4th. As you are aware, I successfully bid on Lot 658 (Andy Warhol, *Marilyn*, set of 10 prints) along with a number of other lots in that auction.

On returning to Christie's the day after the sale to arrange for payment and shipping of my items, I requested that all of my prints be removed from their frames and shipped to me in suitable tubes. At that point I was informed by the head of the department, Mr. Jonathan Rendell, and his assistant, that while most of my items could be shipped as requested, the Warhol prints could not be removed from their frames. I asked for further explanation and Mr. Rendell confirmed that these prints were each permanently affixed to a plexiglass backing. He proceeded to show me as an example how one of the prints was affixed to the plexiglass with permanent glue both along the edges of the print and across the middle of the reverse side of the print. Mr. Rendell also confirmed that, before the sale, Christie's had invited a conservation expert to examine the prints, and the expert verified that the prints were permanently attached and could not be removed without damaging them. When I expressed my dismay and surprise at this discovery, Mr. Rendell agreed that the condition of the prints was highly unusual and that he had never encountered other prints similarly permanently affixed to their frames.

The catalogue description of Lot 658 describes the *Marilyn* prints as "taped in the support". This description fails to clarify either that the "support" is actually a plexiglass backing to the frame, or, most importantly, that the prints are permanently affixed and that the "tape" can never be removed. The mention of "tape" conjures a strip that one often finds holding a print to its support, and that is always very simply removed. "Tape" does not suggest a permanent, irreversible binding. Surprisingly, the catalogue goes on to state that three of the ten prints have been examined out of their frames. To any reader of the catalogue, these words clearly indicate that free and loose prints were examined, rather than valuable prints permanently affixed to sheets of plastic.

Correspondence address: c/o 2A Sydney Close, London SW3 6HW, tel: (+44) 207 589 6114, Fax: (+44) 207 581 2962
Correspondence address: c/o 260 Kifissias Ave & Diligianni Str. 145 62 Kifissia, Tel: (+30)210 62 34 320, Fax: (+30)210 62 30 466

# DOMINICA HOLDING CORP.

Ageltake road, Ageltake Island, Mazuro MR 96 960, Marshall Islands

Any art buyer would expect that a work of art could be removed from its support in a frame; Mr. Rendell affirmed he had never seen an example to the contrary. The fact that Christie's expert had determined these prints were permanently affixed to their frames seems, to me, to be a material omission from the catalogue description which would undoubtedly have significant effect on the value of the prints. The *Marilyn* prints were one of the most important and highly priced lots in the auction, even featured on the cover of the auction catalogue. This further suggests to me that the omission was not likely an oversight but rather the catalogue description was carefully crafted to give the impression these prints were in a condition other than what they are.

For your information, I am a fellow of the British Restorer's Association and a fellow of the International Institute of Conservation, and I know very well from my experience that if a conservator tries to remove these prints from the plexiglass support, even successfully or with minor damages, these prints will never be in their original condition. For that reason I do not intend to proceed with the purchase of lot 658. Furthermore, I am happy to complete my purchase of the other lots for which I successfully bid in the auction (i.e., Lots 398, 629, 632, 636, 637, 638, 661, 662, 674, 677 and 679).

I remain confident that this issue can be resolved amicably and to both of our satisfaction. I have been a loyal client of Christie's for the past thirty-five years, both as a seller and a buyer, and have had innumerable positive experiences in my past dealings with your firm. However, I believe in this instance the catalogue description of the prints on which I bid was misleading regarding a critical feature of the prints.

Furthermore, I note that the content and tone of your letter as well as the general attitude of the staff with whom I have discussed the matter at Christie's has been surprisingly insulting and rather abrupt. As stated above, I hope that this issue will be solved amicably and that we may continue to have a mutually beneficial business relationship as we have had for the last thirty-five years.

Sincerely yours

Stavros Mihalarias

Cc Mr. Edward Dolman, Mr. Stephen S. Lash, Mr. Jonathan Rendell, Ms. Abigail Lash.

Correspondence address: c/o 2A Sydney Close, London SW3 6HN, tel:(+44) 207 589 6114, Fax:(+44) 207 581 2962
Correspondence address: c/o 260 Kifissias Ave & Diligianni Str. 145 62 Kifisaia, Tel:(+30)210 62 34 320, Fax:(+30)210 62 30 466

# Exhibit E

# Hughes Hubbard & Reed LLP

One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Fax: 212-422-4726

Michael E. Salzman
Direct Dial: 212-837-6833
Direct Fax: 212-299-6833
E-mail: salzman@hugheshubbard.com

May 25, 2005

VIA TELECOPY AND MAIL

Mr. Stavros Mihalarias
Dominica Holding Corporation
c/o 2A Sydney Close
London  SW3 6HN
ENGLAND

Re:    Christie's Sale No. 1513, May 4, 2005

Dear Mr. Mihalarias:

Jo Backer Laird has asked me to respond to your letter to her dated May 12, 2005, concerning your purchase of lot 658 at the May 4 sale.

You state in your letter that you have been a seller and buyer at Christie's for the past thirty-five years.  As such, you are certainly well aware that your purchase was made subject to the Conditions of Sale contained in the catalogue for that auction, which are legally binding on you.  *See Csaky v. Meyer*, No. 94 Civ. 8117 (JSM), 1995 WL 494574 (S.D.N.Y. Aug. 18, 1995); *Weisz v. Parke-Bernet Galleries, Inc.*, 77 Misc.2d 80, 351 N.Y.S.2d 911 (1st Dep't App. Term 1974).

Those Conditions of Sale provide, among other things, that the prints in issue were sold

"'as is' without any representation and warranty of any kind by Christie's or the seller.  Buyers are responsible for satisfying themselves concerning the condition of the property and the matters referred to in the catalogue entry."

The courts routinely enforce provisions of this type.  For instance, in *T.T. Exclusive Cars, Inc. v. Christie's Inc.*, 96 Civ. 1650, 1996 WL 737204 (S.D.N.Y. Dec. 24, 1996), a purchaser of an historic car tried to escape liability by alleging that Christie's had incorrectly described the condition of the car.  The federal district court held that, under the Conditions of Sale, it was up to the purchaser to inspect the car himself and he was not entitled to rely upon the description of the car contained in the catalogue.  The United States Court of Appeals affirmed

47, Avenue Georges Mandel
75116 Paris, France
(33) (1) 44.05.80.00

1775 I Street, N.W.
Washington, D.C.
20006-2401
202-721-4600

350 South Grand Avenue
Los Angeles, California
90071-3442
213-613-2800

201 South Biscayne Boulevard
Miami, Florida
33131-4332
305-358-1666

Akasaka Tokyu Building 6F
2-14-3 Nagata-cho, Chiyoda-ku
Tokyo 100-0014 Japan
(81) (3) 3539-2771

101 Hudson Street
Jersey City, New Jersey
07302-3918
201-536-9220

**Hughes Hubbard & Reed** LLP

that decision by summary order. Just two months ago, another court dismissed a lawsuit against Christie's where a purchaser complained that Christie's had failed to warn him sufficiently about repairs to an antique sideboard he had purchased. *Real Property Acquisitions v. Christie's Inc.*, N.Y.L.J., Mar. 29, 2005, at 20 (Sup. Ct. N.Y. County Mar. 18, 2005). The judge wrote, "[plaintiff's] decision not to pursue the rumors, seek additional information, or bring an expert of his choosing to inspect the sideboard, does not alter, modify, or expand the terms published in the catalogue, nor does it support a claim sounding in fraud."

The condition issue you raise in your letter, concerning the fact that the prints are affixed to a plexiglass backing, was entirely obvious to anyone who inspected them at the preview—much less to a fellow of the British Restorers Association and the International Institute of Conservation. This was your responsibility under the law.

Under the Uniform Commercial Code, your May 12, 2005 letter constitutes a repudiation of the auction contract you entered into at the May 4 sale upon the fall of the hammer, and therefore a material breach of that agreement.

Acting pursuant to paragraph 4(f) of the Conditions of Sale, the Uniform Commercial Code and your telephoned request that Christie's seek to sell the lot to the auction underbidder— and as Ms. Laird has advised you by telephone in advance—Christie's has now resold lot 658 for $575,000, inclusive of buyer's premium.

As a result, Christie's and its consignor have been damaged by your breach of the auction contract in the amount of $135,400, plus additional costs, expenses, and attorney's fees. This is calculated as the sum of your winning bid price of $710,400 ($620,000 hammer price plus buyer's premium of $90,400) minus $575,000. This sum is now due and immediately owing to Christie's.

Please be advised that Christie's reserves the right, pursuant to paragraph 4(f)(vii) of the Conditions of Sale to apply any payment you make, or have made, first against your obligation with respect to lot 658, and accordingly, Christie's will not proceed with respect to your bids on lots 349, 629, 632, 636, 637, 638, 661, 662, 674, 677, or 679 until payment of $135,400 is received for Christie's damages on lot 658. Moreover, if payment in full is not received with respect to those lots, Christie's reserves all its rights under paragraph 4(f) with respect to those lots as well, including without limitation the right to cancel those sales and the right to resell those lots and hold you liable for any shortfall.

Your May 12 letter ends with the hope that Christie's "mutually beneficial relationship" with you can continue and an amicable solution be reached. Unfortunately, your repudiation of your auction contract on lot 658 has gravely damaged that relationship. Please be

**Hughes Hubbard & Reed LLP**

Mr. Stavros Mihalarias                                                                 Page 3

advised that, pursuant to paragraph 4(f)(viii), unless and until Christie's is paid in full as outlined above, Christie's no longer wishes to do business with you, whether acting through Dominica or any other entity, agent or trade name. We ask that you not place any further bids with Christie's.

Sincerely,

# Exhibit F

**Hughes Hubbard & Reed LLP**

New York, New York 10004-1482
Telephone: 212-837-6000
Fax: 212-422-4726

Michael E. Salzman
Direct Dial: 212-837-6833
Direct Fax: 212-299-6833
E-mail: salzman@hugheshubbard.com

September 1, 2005

VIA TELECOPY AND MAIL

Mr. Stavros Mihalarias
Dominica Holding Corporation
c/o 2A Sydney Close
London  SW3 6HN
ENGLAND

      Re:    <u>Christie's Sale No. 1513, May 4, 2005</u>

Dear Mr. Mihalarias:

      Christie's Inc. has still not received payment for any of your purchases at Sale 1513 on May 4. These purchases included Lots 398, 629, 632, 636, 637, 638, 658, 661, 662, 674, 677, and 679.

      As we notified you in our letter of May 25, Christie's has resold lot 658 for $575,000, inclusive of buyer's premium, and as a result, Christie's and its consignor have been damaged by your breach of the auction contract in the amount of $135,400, plus additional costs, expenses, and attorney's fees. This is calculated as the sum of your winning bid price of $710,400 ($620,000 hammer price plus buyer's premium of $90,400) minus $575,000. This sum was due and immediately owing to Christie's on May 25, but we still have not received this payment. Christie's redemands payment in the amount of $135,400.

      Also in our letter of May 25, Christie's reserved all its rights under paragraph 4(f) of the Conditions of Sale in the auction catalogue with respect to all remaining lots you purchased at the May 4 sale, including without limitation the right to cancel those sales and the right to resell those lots and hold you liable for any shortfall.

      Pursuant to this, because Christie's still has not received payment for any of these lots, Christie's now elects to cancel the sale to you of two of these lots, and to reoffer them in its upcoming November sale. These are Lot 679, Andy Warhol, *St. Apollonia*, set of four screen prints, and Lot 398, Keith Haring, *Flowers Suite*, set of five screen prints. By this letter, we advise you that Christie's is canceling the sale of Lots 679 and 398 and intends to resell them, and that you will be held liable for any shortfall and expenses.

| | | | | | |
|---|---|---|---|---|---|
| 47, Avenue Georges Mandel | 1775 I Street, N.W. | 350 South Grand Avenue | 201 South Biscayne Boulevard | Akasaka Tokyu Building 6F | 101 Hudson Street |
| 75116 Paris, France | Washington, D.C. | Los Angeles, California | Miami, Florida | 2-14-3 Nagata-cho, Chiyoda-ku | Jersey City, New Jersey |
| (33) (1) 44.05.80.00 | 20006-2401 | 90071-3442 | 33131-4332 | Tokyo 100-0014 Japan | 07302-3918 |
| | 202-721-4600 | 213-613-2800 | 305-358-1666 | (81) (3) 3539-2771 | 201-536-9220 |

NY 979790_1.DOC

Mr. Stavros Mihalarias                                                      Page 2

      Finally, Christie's continues to reserves all its rights under paragraph 4(f) of the Conditions of Sale with respect to all remaining lots you purchased at the May 4 sale, including without limitation the right to cancel those sales and the right to resell those lots and hold you liable for any shortfall.

Sincerely,